IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DEBORAH DAVIS,** : | |
| **Plaintiff** : | |
| : | No. 1:14-cv-0059 |
| : | |
| v. : | (Judge Kane) |
| : | |
| : | |
| **PENNSYLVANIA TURNPIKE** : | |
| **COMMISSION, et al.,** : | |
| **Defendants** : | |

## MEMORANDUM

Before the Court is Defendants' motion for summary judgment.  (Doc. No. 72.)  The motion has been fully briefed and is ripe for disposition.  For the reasons that follow, the Court will grant Defendants' motion in part and grant them summary judgment on all claims except gender discrimination.

**I.   BACKGROUND**[1]

This case concerns Plaintiff Deborah Davis's 2008 termination from her management position at the Defendant Pennsylvania Turnpike Commission.  (Doc. No. 15 at 1-2.)  Plaintiff has named the Pennsylvania Turnpike Commission itself as a defendant in addition to seven individuals affiliated with the Commission at the time of her termination.  (See id.)  Plaintiff's amended complaint contains five counts: (1) common law wrongful termination in violation of Pennsylvania public policy; (2) Title VII gender discrimination; (3) Pennsylvania Human Relations Act gender discrimination; (4) state law civil conspiracy; and (5) federal First Amendment retaliation.  (Doc. No. 15 ¶¶ 97-128.)  Defendants have moved for summary judgment on all counts.  (See Doc. No. 72.)

---

[1] The following background represents the uncontested material facts on Defendants' motion for summary judgment.  Any disagreement of fact is addressed in the margin.

Plaintiff began working at the Commission in December of 1993, originally serving in the Commission's human resources department. (Doc. Nos. 72 ¶¶ 1-2; 75 at 3.) In 2004, Plaintiff assumed the role of Chief of Staff for Operations and Administration, a management position reporting directly to the Commission's Chief Operating Officer, first Kevin Longenbach until February 2007, and then Defendant George Hatalowich. (Doc. Nos. 72 ¶¶ 2-3; 75 at 3.)

### A.   Requests for proposal

While Plaintiff was Chief of Staff, the Commission tendered two requests for proposals to contractors for a "Digital Video Audit System," a surveillance system that could be used to identify and deter theft by Commission toll booth workers. (Doc. No. 72 ¶ 4; 75 at 3.) Plaintiff played a role in both tenders. (Doc. No. 72 ¶¶ 6-10; 75 at 3-4.)

The first procurement process formally began in December 2006. (Doc. No. 72 ¶¶ 4-5; 75 at 3-4.) Non-party Brenda Szeles-Bratina served as the "sponsor" for the first request for production, and in that capacity, "was responsible for forming an Evaluation Committee to review the submitted proposals" from prospective vendors.[2] (Doc. No. 75 ¶¶ 6-7; 75 at 3.) Plaintiff served on the first Evaluation Committee under Ms. Szeles-Bratina. (See id.) In all, the committee considered proposals from seven prospective contractors, including a proposal from Community Networks, LLC. (Doc. No. 72 ¶¶ 7-10; 75 at 3.) Plaintiff prepared an evaluation for Community Networks that reflected her belief that "Community Networks was not the most qualified vendor." (Doc. No. 72 ¶ 10; 75 at 3.) Defendant George Hatalowich, the new Chief Operating Officer to whom Plaintiff directly reported, instructed Plaintiff in a work e-mail "to take the evaluations home over the weekend and modify the strengths and weaknesses for

---

[2] Plaintiff has not specifically denied or concurred in this and other factual assertions in her counter statement of facts. However, the Court accepts these assertions as true based on direct citations to Plaintiff's deposition upon which both the Defendants' and Plaintiff's factual assertions concerning her role in the tenders are based. (See Doc. No. 72 at 36-45; Doc. No. 75 at 3-4.)

2

Community Networks." (Doc. No. 72 ¶¶ 11-12; 75 at 3-4.) Plaintiff complied with Defendant Hatalowich's directive and made alterations to the committee's evaluation of Community Networks's proposal.³ (Doc. No. 72 ¶¶ 14-17; 75 at 4.)

Plaintiff believed that Defendant Hatalowich wished her to alter the Community Networks evaluation to make its proposal more attractive, and while the extent of the alterations is disputed, the parties agree that Plaintiff did make changes to the evaluation to show Community Networks's proposal in a more positive (or less negative) light. (See Doc. Nos. 72 ¶ 15; 75 at 3.) Although the Commission's Procurement Technical Review Committee recommended discussions with Community Networks, the Commission ultimately decided not to contract with any vendors from the first tender. (Doc. Nos. 72 ¶¶ 17-19; 75 at 4.) After this determination was made, Defendant Joseph Brimmeier, who was then the Chief Executive Officer of the Commission, spoke to Plaintiff and asked if she believed that Community Networks could accomplish the goals of the video system tender. (Doc. No. 75 at 4; 72-1, Tr. at 67:15 – 68:2; 77 ¶¶ 10-12.) Plaintiff told Defendant Brimmeier that Community Networks could accomplish the goals of the tender, but suggested that other prospective vendors could be more efficient. (Doc. No. 75 at 4; 72-1, Tr. at 67:15 – 68:2; 77 ¶¶ 10-12.)

After this conversation, the Commission initiated a second request for proposal.⁴ (Doc. No. 72 ¶¶ 19-20.) This time, Plaintiff served as the sponsor for the tender. (Id. ¶¶ 20-21.) While

---

³ Defendants aver that Plaintiff modified the evaluations of two other would-be vendors, e-Transit and SYS, relying on Plaintiff's inconsistent deposition testimony on the subject and an e-mail that a non-party Commission affiliate sent to Defendant Hatalowich. (Doc. No. 75 ¶¶ 16-17.) Plaintiff does not respond to this factual assertion in her counter-statement of facts, and Plaintiff hypothesized in her deposition that, if she did make additional modifications, such modifications may have been intended "to make it look less like we were just working on Community Networks['s evaluation.]" (Doc. No. 75 at 3-4; 72-1, Tr. at 75:17-23.)
⁴ Plaintiff's counter-statement of facts is silent as to the second request for proposal. (See Doc. No. 75 at 4.) However, there is no serious dispute that the second tender occurred or that

several vendors, including Community Networks, submitted or renewed proposals, the Commission again decided to reject all proposals. (Id. ¶¶ 23-25.) Plaintiff was not asked to treat any vendor more favorably in the second tender or to alter any evaluation results. (Id.)

      B.      **Plaintiff's termination**

In November 2008, Defendant Hatalowich circulated a memorandum to Commission employees.[5] (Doc. No. 72 ¶¶ 29-30); (see also Doc. No. 72-2 at 31-32) (circulatory to Commission employees from Defendant Hatalowich). In the memorandum, Defendant Hatalowich informed employees that due to a downturn in traffic volumes, the Commission was implementing a voluntary departure program for employees in order to reduce operating costs. (Id.) Under the program, employees who chose to leave their employment at the Commission would receive an amount of severance compensation on a sliding scale that increased according to the length of employment with the Commission. (Id.) The memorandum closed by warning employees that, "[i]f the number of employees who elect[ed]" to leave voluntarily was "insufficient to achieve the necessary savings, an involuntary reduction in force" could be necessary. (Id. at 32.) The record does not indicate the precise cost savings needed at the Commission, the number of employees who opted to leave their employment voluntarily, or the cost savings realized by those departures.

Later in November, the Commission held a meeting to discuss terminating employees involuntarily. (Doc. Nos. 72 ¶¶ 32-33; 72-2 at 36-41.) Defendants have attached a record showing that fifteen positions were recommended for termination, including Plaintiff's. (Id.)

---

Plaintiff worked on the tender as averred by Defendants and recounted in Defendants' documentary attachments and Plaintiff's deposition. (See Doc. No. 72 ¶¶ 20-25.)
[5] Again, Plaintiff's counter-statement of material facts is not responsive to Defendants' timeline of events surrounding Plaintiff's termination. (See Doc. No. 75 at 4-5.)

Eight of the terminated employees are male, and seven of the terminated employees are female. (Id.) Plaintiff was the most highly paid employee to be terminated. (Doc. No. 72-2 at 38.)

The Commission informed Plaintiff of her termination by letter dated November 20, 2008. (Doc. No. 72-2 at 43.) The letter informed Plaintiff that her position had been eliminated for "budgetary reasons," and that her termination was to take immediate effect. (Id.) In addition, the letter provided that Plaintiff's salary would continue for two weeks, that her final pay would be issued December 18, 2008, and that her leave payout would occur on December 31, 2008. (Id.)

### C. Kevin Longenbach and Blair Fishburn

Plaintiff has repeatedly named Kevin Longenbach and Blair Fishburn as individuals who were similarly situated to her but who received better treatment at their separation from employment than Plaintiff received. (See Doc. No. 75 at 4.)

Mr. Longenbach resigned from his position as Chief Operating Officer of the Commission in February 2007. (See Doc. No. 72-2.) In her deposition testimony – which Defendants rely on in their statement of undisputed material facts – Plaintiff averred that Mr. Longenbach was given advance notice of his termination and granted severance equal to approximately ninety days of continued employment. (See Doc. Nos. 72 ¶¶ 37-40; 75 at 4) (see also Doc. No. 72-2, Tr. at 49:13 – 50:9.) Mr. Fishburn, who served as the Commission's Chief Financial Officer and reported directly to the Chief Operating Officer at the time of his separation, also received notice of his termination and a severance package greater than that offered to Plaintiff. (See Doc. Nos. 72 ¶¶ 44-45; 75 at 4-5) (see also Doc. No. 72-2, Tr. at 50-15-19). Neither Mr. Longenbach nor Mr. Fishburn left the Commission under the same involuntary termination as Plaintiff did, and neither held Plaintiff's position as Chief of Staff for Operations

and Administration.  (See Doc. No. 72 ¶¶ 46-48.)  All of the employees who departed the Commission under the same termination program as Plaintiff received as much or less severance and notice as Plaintiff received.  (Id.)

### D.     Relevant post-termination events

Certain events that occurred after Plaintiff's separation from her employment are relevant to the timeliness of her complaint.  On May 18, 2009, Plaintiff filed an administrative complaint with the Pennsylvania Human Relations Commission (the PHRC) alleging that her termination was the result of gender discrimination.  (Doc. No. 15 ¶¶ 35-36.)  After making a finding of probable cause, the PHRC issued Plaintiff a right to sue letter on June 11, 2010, and the proceedings within the state administrative system did not close until Plaintiff initiated her federal lawsuit.  (Id. ¶¶ 40-45.)

In addition, Plaintiff alleges that the criminal prosecution of certain individual defendants impacts the timeliness of her complaint.  The record is undisputed that on March 13, 2013, criminal corruption charges against Defendants Hatalowich and Brimmeier were announced and that Plaintiff testified in connection with those indictments during 2009 and 2011.  (See Doc. Nos. 15 ¶¶ 87-90; 72-2, Tr. at 211:18 – 213:5 and Tr. at 216:10 – 218:7; 77 at 25-31.)  The parties dispute whether the tenders for the digital video auditing system were germane to the criminal proceedings.

### E.     Procedural history

Plaintiff initiated this lawsuit by filing a federal complaint on January 14, 2014.  (Doc. No. 1.)  Fact discovery closed on February 19, 2016 (Doc. No. 67), and Defendants filed the present motion for summary judgment on April 21, 2016 (Doc. No. 72).  The motion has been fully briefed and is ripe for disposition.

## II.	LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's

7

evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Further, a party may not defeat a motion for summary judgment with evidence that could not be presented in an admissible form at trial. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

### III. DISCUSSION

Defendants seek summary judgment on each of Plaintiffs' claims. Defendants' arguments concern two affirmative defenses: (1) untimeliness, and (2) sovereign immunity. Defendants have also argued that Plaintiff will not satisfy her burden on the merits of one or more elements of her claims. The Court turns first to the affirmative defenses, and then turns to Defendants' arguments on the merits.

#### A. Timeliness

Defendants seek summary judgment based on untimeliness for Plaintiff's common law wrongful termination and civil conspiracy claims. (Doc. No. 72 at 8-9, 22.) In opposition, Plaintiff argues that the doctrine of equitable tolling should apply and excuse the otherwise untimely filing of her complaint as to her common law wrongful termination claim. (Doc. No. 75 at 6-7.) The Court agrees with Defendants and will dismiss Plaintiff's wrongful termination and civil conspiracy claims as untimely.

In very limited circumstances, Pennsylvania recognizes a judge-made claim for wrongful termination in violation of public policy. See McLaughlin v. Gastrointestinal Specialists, Inc., 70 A.2d 283, 287 (Pa. 2000). The statute of limitations for wrongful discharge actions under Pennsylvania law is two years, and the period begins to run from the date that the employment

ends. Langan v. Proctor & Gamble Co., 2009 WL 1816950, at **2-3 (M.D. Pa. June 24, 2009) (citing Raleigh v. Westinghouse Elec. Corp., 550 A.2d 1013, 1014 (Pa. Super. Ct. 1998)). Plaintiff's claim that Defendants conspired to wrongfully terminate her is governed by the same two-year statute of limitations as the substantive tort. Kingston Coal Co. v. Felton Min. Co., Inc., 690 A.2d 284, 286 n.1 (Pa. Super. Ct. 1997).

As a threshold matter, the statute of limitations for Plaintiff's wrongful discharge and associated conspiracy began to run on the date of her termination in 2008, and she commenced her federal lawsuit in 2014. (See Doc. No. 1.) Accordingly, Plaintiff's wrongful discharge and conspiracy claims are untimely on the face of the complaint.

Plaintiff attempts to save these claims by invoking the equitable tolling doctrine. (Doc. No. 75 at 6-7.) In general, "a cause of action accrues, and thus the applicable limitations period begins to run, when an injury is inflicted." Wilson v. El-Daief, 964 A.2d 354, 361 (Pa. 2009). However, under the doctrine of equitable tolling, the statute of limitations only begins to run when a plaintiff knows, or with reasonable diligence could know, "that he is injured and by what cause." Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005). More particularly, commencement of the limitations period occurs upon "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury . . . or precise cause." Wilson, 964 A.2d at 364 (emphasis added). Applying the related federal doctrine to an employment context, the United States Court of Appeals for the Third Circuit held that the statutory period begins to run "when the plaintiff knows or reasonably should know that the discriminatory act has occurred, not on the date the victim first perceived that a discriminatory motive caused the act."[6] Oshiver v. Levin, Fishbein,

---

[6] The parties did not differentiate between equitable tolling and the discovery rule, and neither party took a position on whether the federal or Pennsylvania laws on the subject should apply.

Sedran & Berman, 38 F.3d 1380, 1386-87 (3d Cir. 1994) (citing Merrill v. Southern Methodist Univ., 806 F.2d 600, 604-05 (5th Cir. 1986)).  A plaintiff bears the burden of establishing the applicability of the discovery rule.  Wilson, 964 A.2d at 362.

Plaintiff may not successfully invoke the discovery rule or equitable tolling to save her claims.  The undisputed material facts reveal that Plaintiff separated from her employment in November of 2008.  Therefore, the applicable statute of limitations, began to run at the time of her termination at the time when her claim accrued.  Indeed, Plaintiff did pursue timely administrative proceedings for gender discrimination with the federal Equal Employment Opportunity Commission.  Further, even were the Court to accept Plaintiff's assertion that the statute of limitations began to run at some point after her termination, the Court finds that constructive knowledge of wrongdoing in the nature asserted in the complaint can be attributed to Plaintiff when she was called to testify at grand jury proceedings related to the corrupt practices she alleges here.  While the record does not indicate the precise dates of Plaintiff's testimony, she testified in 2009 and 2010, well more than two years before she filed her federal complaint.  As a result, the Court will dismiss the wrongful termination and civil conspiracy claims from Plaintiff's amended complaint.

**B.     Sovereign immunity**

In addition, Defendants have raised the defense of sovereign immunity with regard to Plaintiff's claims for wrongful termination in violation of public policy and civil conspiracy.  (Doc. No. 72 at 17-20, 22-23.)  Defendants argue that the Commission is a state entity entitled to immunity and that the state has not waived immunity for these causes of action.  (Id.)  In opposition, Plaintiff argues that individual Defendants are not entitled to immunity because their

tortious actions fell outside the scope of their employment with the Commission. (Doc. No. 75 at 7-8.)

As a threshold matter, it is now undisputed that the Commission is an independent agency of the Commonwealth that enjoys the same tort immunity as the state. Zauflik v. Pennsbury Sch. Dist., 104 A.3d 1096, 1128 n.17 (Pa. 2014). Pennsylvania has explicitly enumerated the limited circumstances under which it waives its immunity in the Sovereign Immunity Act, 42 Pa. Cons. Stat. §§ 8501, et seq. These nine categories of torts include those caused by: state automobiles, medical malpractice, state personal property, state real estate and highways, potholes, state animals, state liquor stores, National Guard activities, and "toxoids and vaccines." 42 Pa. Cons. Stat. § 8522. Further, the act protects agents and employees of state agencies from tort liability when they act "within the scope of their duties," even if the act committed is alleged to constitute an intentional tort. 1 Pa. Cons. Stat. § 2310; see also Kull v. Guisse, 2013 WL 5762235, at *4 n.5 (Pa. Commw. Ct. Oct. 16, 2013) ("[S]tate employees do not lose their sovereign immunity protection for intentional torts committed within the scope of their employment.").

In the present case, the Commission itself is undeniably immune from suit for wrongful termination and civil conspiracy because it is a state agency and immunity has not been waived. Similarly, the individual employees of the Commission are entitled to immunity. Plaintiff argues that the allegedly illegal actions taken by Defendants Brimmeier and Hatalowich in particular were outside the scope of their employment, however, the factual allegations in the amended complaint reveal that all actions taken by the individual defendants were part of either the human resources activities or procurement activities of the Commission. Accordingly, even if those actions were illegal or intentionally tortious, they formed part of the activities of the

Commission, so both the Commission itself and its individual agents are entitled to immunity on Plaintiff's wrongful discharge common law claim and her civil conspiracy claim.

### C. Merits challenges

The Court now turns to the specific deficiencies in Plaintiff's case that Defendants argue entitle them to judgment as a matter of law. The Court will order summary judgment as to all of Plaintiff's claims except for gender discrimination.

#### i. State common law wrongful termination[7]

Defendants seek summary judgment on Plaintiff's claim for wrongful termination in violation of Pennsylvania public policy because Plaintiff did not take any action protected by public policy. (See Doc. No. 72 at 20-21.) According to Defendants, Plaintiff did not refuse to alter the evaluations at all, but instead she complied with Defendant Hatalowich's instruction to modify the evaluation. (Id.) Plaintiff does not specifically respond to Defendants' merits-based challenge to her public policy wrongful termination claim. (See Doc. No. 75 at 6-8.)

Pennsylvania hews to the "traditional view" of at-will employment, so generally speaking, an employer may terminate an at-will employee for any reason or for no reason at all. Rothrock v. Rothrock Motor Sales, Inc., 883 A.2d 511, 516 (Pa. 2005). However, the Supreme Court of Pennsylvania has recognized a very limited exception, affording terminated employees a claim for relief in the rare case where the termination violates "a clear mandate of [Pennsylvania] public policy." McLaughlin v. Gastrointestinal Specialists, Inc., 70 A.2d 283, 287 (Pa. 2000). Typically, such a "clear mandate" exists only where an employer has committed an illegal act or has induced its employee to do the same, because "absent a violation

---

[7] The Court has already found that this claim is both untimely and barred by the doctrine of sovereign immunity. The Court's merits holding is made in the alternative. Further, this claim relates only to Pennsylvania public policy; to the extent that Plaintiff seeks to invoke the federal First Amendment in relation to this claim, that argument is addressed in the Court's consideration below of her First Amendment retaliation claim.

of law, it is difficult for an at-will employee seeking recovery for wrongful discharge to point to a common law, legislative, or constitutional principle from which a clear public policy [mandate] could be inferred." Clark v. Modern Grp, Ltd., 9 F.3d 321, 328 (3d Cir. 1993).

Upon the record before the Court, Defendants have carried their burden of showing that Plaintiff will not be able to succeed on this claim at trial. While Plaintiff has raised the specter of criminal activity throughout her complaint and supporting papers (e.g., Doc. No. 15 ¶¶ 48-65), the only connection she identifies between her employment and the illegal activities revolves around Defendant Hatalowich's instruction – with which she complied – to alter the Community Networks evaluation in connection with the first procurement process for the video system (see (Doc. Nos. 72 ¶¶ 14-17; 75 at 4). Plaintiff may not succeed on her public policy claim by establishing that illegal activity was generally occurring at the Commission around the time of her separation from employment. Instead, it is incumbent upon Plaintiff to show that <u>her termination</u> violated public policy, especially given the narrowness of the public policy exception to at-will employment. In the absence of a more articulable connection between the alleged criminal conduct at the Commission and Plaintiff's termination, Defendants are entitled to summary judgment on merits of this claim.[8]

      **ii.    First Amendment retaliation**

In addition, Defendants have argued that Plaintiff's First Amendment retaliation claim fails because Plaintiff never alleged that she engaged in any activity protected by the First Amendment. (Doc. No. 72 at 25.) In opposition, Plaintiff argues that "Plaintiff's speech was not

---

[8] Defendants also seek summary judgment on Plaintiff's civil conspiracy claim related to the allegedly concerted actions of individual defendants to wrongfully terminate Plaintiff's employment. (Doc. No. 72 at 21.) Having found the civil conspiracy claim barred by sovereign immunity and the statute of limitations, and having found no merit in Plaintiff's underlying common law wrongful discharge claim, the Court does not write separately to address Defendants' merits challenge to the conspiracy claim.

in the refusal to modify the strengths and weaknesses of the Community Networks proposal, but in not amending the strengths and weaknesses enough to satisfy the Commission and Defendants Hatalowich and Brimmeier." (Doc. No. 75 at 8.) In their reply brief, Defendants argue that to be protected, conduct must be "expressive" and convey a message, and that Plaintiff's actions were not expressive, so her new theory does not entitle her to relief. (Doc. No. 77 at 9-10.)

A plaintiff may be entitled to relief on a theory of First Amendment retaliation where he or she can show: (1) that he or she engaged in an activity "protected by the First Amendment," and (2) that his or her involvement in "the protected activity was a substantial factor in the alleged retaliatory action."[9] Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006). As to the first prong, special rules govern the reach of the First Amendment in the public employment context. Governments acting as employers may regulate the speech and expression of their employees to a greater extent than governments may limit the speech or expression of ordinary citizens. See Connick v. Myers, 461 U.S. 138, 143 (1983) ("[G]overnment offices could not function if every employment decision became a constitutional matter.") As a result, a public employee's expression is generally not subject to the protection of the First Amendment unless the expression satisfies additional criteria that ordinary citizens' expression need not satisfy. See Hill, 455 F.3d at 241-42.

Public employee speech is protected only when it satisfies three criteria derived from the Supreme Court's Connick decision, and in particular: (1) the speech was made in the employee's capacity as a "citizen," and not pursuant to "official duties;" (2) the expression "involves a matter of public concern;" and (3) "the government employer did not have 'an adequate

---

[9] Defendants focus their efforts on the first element, arguing that Plaintiff did not engage in any protected speech or expressive conduct. (See Doc. No. 72 at 25.)

justification for treating the employee differently from any other member of the general public.'" Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (quoting Hill, 455 F.3d at 241).

A public-employee-plaintiff's actions may constitute "expressive conduct," and not speech per se. See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 158 (3d Cir. 2002). However, the same additional strictures from Connick that restrict the First Amendment's application to speech in the public employment context also apply to expressive conduct, so for purposes of First Amendment retaliation claims, the distinction between speech and other expressive conduct is not material. See Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 386-88. 399 (2011) (subjecting First Amendment rights outside of the Speech Clause to three Connick gatekeeping criteria in public employment retaliation context). The burden of demonstrating the applicability of the First Amendment to a particular case ultimately rests with the party asserting that protection. See id.

Before turning to the merits of the claim, the Court first considers whether Plaintiff's position is supported by the record. Plaintiff's suggestion that she refused to modify the evaluation reports radically enough to satisfy Defendant Hatalowich as a way to send him a message, even though she admittedly did modify the evaluation to some extent, does find limited support in the record:

> Defense counsel: [W]ho at the commission did you state or did you tell that you would not perform illegal acts?
>
> Plaintiff: No one directly.
>
> Defense counsel: Did you tell anyone indirectly?
>
> Plaintiff: Through the work product. I think that spoke for itself.
> Defense counsel: By work product, you mean the master collection of the strengths and weaknesses for the vendors?
>
> Plaintiff: Yes.

(Doc. No. 72-1, Tr. at 160:15 – 161:1). In addition, a paragraph from the amended complaint could be read to support Plaintiff's position. (Doc. No. 15 ¶ 77.) According to the paragraph, Plaintiff refused "to further alter Community Networks, LLC's evaluation bid because Plaintiff knew that such an act would have been illegal." (Id.) Drawing inferences in favor of Plaintiff, the Court will assume that Plaintiff did indeed modify the Community Networks evaluation to a lesser degree than she believed Defendant Hatalowich desired, and that in doing so, she intended to communicate to Defendants that she would not fully cooperate in Defendant Hatalowich and Brimmeier's alleged plan to manipulate the procurement process.

Even accepting Plaintiff's account of her own actions, however, the Court finds that Plaintiff cannot succeed on her First Amendment retaliation claim because her expression occurred within the confines of her employment. The Court does not need to decide whether Plaintiff's actions constituted "speech" or "expressive conduct," because the result is the same for both categories. See Guarnieri, 564 U.S. at 386-88. More critically, Plaintiff's expression must satisfy the three Connick criteria in order to invoke the First Amendment, and she cannot satisfy the so-called "citizen capacity" criterion. Under Connick, a public employee may not succeed on a First Amendment retaliation claim against his or her government employer unless the employee was speaking or expressing herself in her capacity "as a citizen," and not "pursuant to [her] official duties." Gorum, 561 F.3d at 179 (quotations omitted). The outcome of Plaintiff's case is governed by the United States Supreme Court's application of the citizen capacity criterion in Garcetti v. Ceballos, 547 U.S. 410 (2006).

The Garcetti plaintiff was a deputy district attorney who, at the urging of a defendant in his jurisdiction, reviewed an "affidavit used to obtain a critical search warrant" in the defendant's case. 547 U.S. at 413. The attorney-plaintiff found that the affidavit contained "serious

16

misrepresentations," and he entreated his supervisors to halt the prosecution based on what he perceived to be law enforcement misconduct. Id. at 414-15. The attorney-plaintiff ultimately testified for the defense at a hearing on the search warrant. Id. at 414-15. After what the Supreme Court described as "a series of retaliatory employment actions," the attorney-plaintiff then sued his employer, alleging First Amendment retaliation. Id. at 415. Applying the citizen capacity criterion from Connick, the Garcetti court held that the plaintiff's claim could not proceed because his expression "owe[d] its existence to [his] professional responsibilities," so it did "not infringe any liberties the employee may have enjoyed as a private citizen." Id. at 421-22. The "significant point" for application of the citizen capacity criterion is that the speech is undertaken "pursuant to [the employee's] official duties," broadly construed. Id.

In the same way as the Garcetti attorney, Plaintiff's expression unquestionably "owed its existence" to her position at the Commission and on the evaluation committee, so that expression is not entitled to the protection of the First Amendment for purposes of a retaliation claim. The Garcetti court compared that plaintiff's case to another case in which a school teacher's First Amendment retaliation claim was permitted to proceed against his employer. Id. at 422. In the comparison case, the school teacher had written letters to the newspaper critical of the local school board in a way that "bore similarities to letters submitted by numerous citizens every day." Id. (citing Pickering v. Bd. of Ed. Of Tp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563 (1968)). Unlike the opinion letters from Pickering, both the Garcetti plaintiff's speech and Plaintiff's expression in the present case fell squarely within the confines of their public employment, and as a result, may not form the basis of a retaliation claim. See id. Consequently, Defendants are entitled to summary judgment on this claim.

   **iii.**  **Gender discrimination**

Finally, Defendants have moved for summary judgment on Plaintiff's gender discrimination claims.[10]  Defendant argue only that Plaintiff has not shown that she was terminated under circumstances giving rise to an inference of gender discrimination, and in particular, (1) that she has not identified similarly situated male employees that received better treatment, (2) that the Commission has shown a legitimate budgetary reason for terminating her employment, and (3) that Plaintiff cannot show that the budgetary justification for her termination was pretextual.  (Doc. No. 72 at 25-32.)  In opposition, Plaintiff argues that Defendants have misconstrued her gender discrimination claim as being based upon her termination, rather than her severance pay and notice.  (Doc. No. 75 at 8-10.)  In addition, she has identified two male executives, Kevin Longenbach and Blair Fishburn, who left the Commission but were offered notice of their terminations and severance packages much more generous than that offered to Plaintiff.  (Doc. No. 75 at 8-10.)

In the seminal case of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the Supreme court created a burden-shifting framework that governs claims under both Title VII and, by subsequent judicial extension, the PHRA.  Atkinson v. LaFayette Coll., 460 F.3d 447, 454 (3d Cir. 2006).  First, a plaintiff must make a prima facie showing of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  To make such a showing, a plaintiff must demonstrate: (1) that he or she is a member of a protected class; (2) that he or she was qualified for the position she held or sought; (3) that he or she suffered an adverse employment action; and (4) that similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of her termination give rise to an inference of

---

[10] Plaintiff has brought claims under both Title VII under the Pennsylvania Human Relations Act. (Doc. No. 15 ¶¶ 107-116.)  The legal standards for these claims are identical, so the Court addresses them together.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 316 n.3 (3d Cir. 2000).

18

discrimination. Id. at 410-411. If the plaintiff makes a prima facie showing of discrimination, the burden shifts to the defendant, who must then "articulate some legitimate nondiscriminatory reason" for the allegedly discriminatory act. Id. (quotations omitted). Thereafter, if the defendant can make such a showing, the burden passes back to the plaintiff to demonstrate that the defendant's proffered justification for its actions is merely pretextual. Id.

At the outset, the Court observes that much of Defendants' arguments on the gender discrimination claims are made under the mistaken belief that the amended complaint alleges that Plaintiff was terminated as the result of gender discrimination. (See e.g., Doc. No. 77 at 13-14.) As Plaintiff argued in opposition and as is clear from the amended complaint, Plaintiff's gender discrimination claims are not premised on Plaintiff's termination itself, but rather upon the Commission's failure to offer sufficient notice and severance compensation to Plaintiff in connection with her termination. (See Doc. No. 15 ¶¶ 107-116.)

Turning to the McDonnell Douglas framework, the Court first asks whether Plaintiff has made the requisite prima facie showing of discrimination. Defendants have conceded, for the purposes of this motion, the first three prongs of the prima facie showing Plaintiff must make, including a concession "that [Plaintiff] was discharged from employment without severance compensation and advance notice." (Doc. No. 73 at 26.) Consequently, the Court asks only whether Plaintiff has identified similarly situated individuals who received better treatment, or whether she can show that circumstances otherwise gave rise to the inference of discrimination. Jones, 198 F.3d at 410.

Plaintiff has sufficiently demonstrated that Messrs. Longenbach and Fishburn are similarly situated individuals who received more notice of termination and better severance than Plaintiff received to survive summary judgment. There is record evidence to support Plaintiff's

19

position that those two men occupied similarly senior positions with the Commission, that each left the Commission's employ within a reasonable time before Plaintiff was terminated, and that both received substantially more notice and better severance packages. (Doc. Nos. 72-1, Tr. at 48:15 – 50:23, 86-88; 72-2 at 38-40, 43-45, 61-63, 65-66, 68-70.)

Continuing to the next stage of the McDonnell Douglas framework, the Court notes that Defendants have proffered non-discriminatory reasons for Plaintiff's termination but have made no arguments concerning a non-discriminatory reason for the difference in severance pay and notice. Defendants have not carried their burden. Consequently, the Court will deny Defendants' motion for summary judgment on the gender discrimination claims.

IV. **CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' motion in part and grant summary judgment on all claims except for Plaintiff's Title VII and PHRA gender discrimination claims. An order consistent with this memorandum follows.